Argued and submitted May 5, the judgment of the circuit court and decision of the
Court of Appeals affirmed and remanded to circuit court for further proceedings
July 12, 1988

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## ROGER JONATHAN SCOTT CAMPBELL,
*Respondent on Review.*

(TC 85-164, 85-165; CA A37511; SC S34651)

759 P2d 1040

Philip Schradle, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the petition were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Michael D. Curtis, Metropolitan Public Defender, Oregon City, argued the cause for respondent on review.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson and Gillette, Justices.

LENT, J.

**LENT, J.**

The issue is whether police use of a radio transmitter to locate a private automobile to which the transmitter has been surreptitiously attached is a "search" or "seizure" under Article I, section 9, of the Oregon Constitution.[1] We hold that it is a search. Because no warrant authorized the police to locate defendant's automobile in this manner, we affirm the decisions of the circuit court and the Court of Appeals to suppress the evidence thereby obtained.

## I.

1.      We base our statement of the facts on the findings of the circuit court.[2] A trial court's findings are binding upon appellate courts if there is constitutionally sufficient evidence in the record to support those findings. *See State v. Warner,* 284 Or 147, 156-59, 585 P2d 681 (1978).

In late 1984, police officers in Washington and Columbia Counties began to suspect that defendant was committing residential burglaries in a rural area along the border of those two counties. The police suspected defendant because he was then on probation for burglaries that were committed in a somewhat similar fashion, because he lived in the area, and because his automobile had been seen near some of the burglarized residences when those burglaries were thought to have been committed.[3] To verify their suspicion, police

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[2] This court has for many years urged trial courts to make adequate findings of fact in pretrial orders. *See, e.g., State v. Wise,* 305 Or 78, 81, 749 P2d 1179 (1988); *State v. Chinn,* 231 Or 259, 262 n 1, 373 P2d 392 (1962). We acknowledge the thorough and pertinent findings of this circuit court judge.

[3] Witnesses for the state at the suppression hearing could only generally state the reasons for suspecting defendant of committing the burglaries. For example, they testified that defendant's automobile had been seen "near" or "in the area" of some of the burglaries, but they did not testify how near or even which burglaries. Especially given that defendant lived in the area, these details would have been important to any judicial evaluation of the substantiality of the police officers' suspicion. In addition, the similarity between the burglaries of which defendant was convicted and the burglaries of which he was suspected was stated as "kicking in front doors to gain entrance and then taking all kinds of property." The circuit court found that this *"modus*

officers attempted to follow defendant's automobile on a number of occasions but were unsuccessful. The rural area made it difficult to follow defendant closely without detection, and defendant began to drive evasively after becoming aware of the efforts to follow him.

Having failed to follow defendant visually, members of the Washington County Sheriff's Office decided to follow him by means of a radio transmitter attached to his automobile. A detective from that office testified that radio transmitters were used to follow individuals pursuant to "in-house criteria."

> "Number one, it has to be a person that our intelligence tells [us] is active in whatever criminal activity we're trying to investigate. Number two, another major consideration that we have is we have attempted to follow them through our ordinary means. That means to have four or five cars out and try on their regular moving surveillance to follow the person. It's after that fails and we have no other resource then we will use the bird dogs [radio transmitters]."

The detective testified that no effort was made to obtain a search warrant to attach or monitor the transmitter because no warrant was believed to be required so long as the attachment was to the outside of the automobile while it was in a public place.

On January 15, 1985, a Washington County Sheriff's Office detective surreptitiously attached a small, battery-powered radio transmitter to the underside of defendant's automobile while it was parked in a public parking lot. Magnets in the transmitter held it to the automobile, and the attachment was made without entering the vehicle. The transmitter broadcasted a radio signal by which a companion receiver placed in an automobile or aircraft could determine the direction of the transmitter from the receiver. By gauging the strength of the signal received, a rough estimate of the transmitter's distance could also be made.

Initial efforts to follow defendant's automobile with a

---

*operandi*" was not "unusual or unique and that burglars in general often entered residences in such fashion and took such articles." The court concluded that the facts presented did not establish probable cause to believe that defendant was engaged in burglarizing residences in the area.

ground-based receiver were either unsuccessful or did not uncover any criminal activity. On January 21, 1985, a police officer replaced the transmitter's batteries, again while the automobile was in a public parking lot. The next day, after failing to pick up the signal with the ground-based receiver, officers attempted to locate the automobile with a receiver in a small airplane. That receiver also failed to pick up the signal in the area in which the burglaries had been committed, but, by climbing to 4500 feet and flying in widening patterns, the officers were able to pick up a faint signal, which was tracked to a rural area near Molalla, Oregon, some 40 miles to the southeast in Clackamas County. There they discovered defendant's automobile parked along a public road near a residence. From the airplane, they visually followed the automobile when it moved to the driveway of another residence, where they observed defendant get out of the automobile and act in a manner that suggested to them that he was burglarizing the residence.

Defendant was indicted for burglarizing the two Clackamas County residences and moved to suppress all evidence derived from the use of the radio transmitter attached to his automobile.[4] The circuit court held that use of the transmitter required a warrant based upon a showing of probable cause to believe that defendant's automobile was engaged in ongoing criminal activity. Because the police had not obtained a warrant, and because the court concluded that no exigency obviated the need for a warrant, the court allowed defendant's motion to suppress.

On the state's appeal pursuant to ORS 138.060(3), a panel of the Court of Appeals affirmed with one judge dissenting. *State v. Campbell,* 87 Or App 415, 742 P2d 683 (1987). The court held that the attachment and monitoring of the transmitter was a significant "trespass" to defendant's automobile and was, for that reason, a seizure of the automobile under the Oregon Constitution. 87 Or App at 420. The dissenting judge would have held that there was no seizure because there was no interference with defendant's use of his automobile and no search because defendant had no privacy interest in the use of

---

[4] Defendant did not challenge the visual observations from the airplane, except as the product of the use of the transmitter.

his automobile in a public place. 87 Or App at 422-23 (Warren, J., dissenting).

## II.

■■■ Defendant argues that the attachment and monitoring of the transmitter violated his rights under Article I, section 9, and the Fourth Amendment to the United States Constitution.[5] Before deciding a federal claim, we must first consider and decide all questions of state law. *State v. Kennedy,* 295 Or 260, 262-65, 666 P2d 1316 (1983) (citing cases). "This is required, not for the sake either of parochialism or of style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law." *Sterling v. Cupp,* 290 Or 611, 614, 625 P2d 123 (1981); *see also State v. Spada,* 286 Or 305, 309, 594 P2d 815 (1979). We also may not reach a state constitutional issue if a claim is fully satisfied under other provisions of state law. *See, e.g., State v. Valdez,* 277 Or 621, 629, 561 P2d 1006 (1977). This rule applies even if the parties have raised only constitutional issues on appeal. *State v. Spada, supra,* 286 Or at 309.

■ In accordance with their "in-house criteria," the police officers attached and monitored the transmitter on defendant's automobile in order to investigate and prevent the crime of burglary, ORS 164.225. No Oregon statute governs the use of radio transmitters to locate objects or people, and, apart from what the constitution may require, the conduct of the police officers in attaching and monitoring the transmitter was not contrary to any other law. The issue on which the lawfulness of the police conduct turns, then, is whether the attachment or monitoring of the transmitter was a search or seizure under Article I, section 9, of the Oregon Constitution.

---

[5] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Fourth Amendment applies to the states through the due process clause of the Fourteenth Amendment. *Ker v. California,* 374 US 23, 30-34, 83 S Ct 1623, 10 L Ed 2d 726 (1963).

A search or seizure to obtain evidence of a crime is unconstitutional if no warrant authorized the search or seizure and there is no exigency that would obviate the need for a warrant. *State v. Kosta,* 304 Or 549, 553, 748 P2d 72 (1987); *State v. Owens,* 302 Or 196, 205-06, 729 P2d 524 (1986). In this case, there was neither a warrant nor any exigency that would have obviated the need for a warrant. If the attachment or monitoring of the transmitter was a search or seizure, the motion to suppress was properly allowed. *See State v. Kosta, supra,* 304 Or at 553; *State v. Tanner,* 304 Or 312, 315, 745 P2d 757 (1987); *State v. Davis,* 295 Or 227, 231-37, 666 P2d 802 (1983); *State v. Laundy,* 103 Or 443, 494, 204 P 958, 206 P 290 (1922).

## III.

This court has often stated that "privacy" is the interest protected by Article I, section 9, against unreasonable searches but has had little occasion to further define that interest. *See, e.g., State v. Tanner, supra,* 304 Or at 319; *State v. Owens, supra,* 302 Or at 206; *State v. Louis,* 296 Or 57, 60-61, 672 P2d 708 (1983); *State v. Elkins,* 245 Or 279, 288-92, 422 P2d 250 (1966). Nearly all of the government actions that have been challenged under Article I, section 9, have long been recognized as searches, and the court has had no difficulty equating these traditionally recognized searches with infringements of privacy interests. *See, e.g., State v. Louis, supra,* 296 Or at 60.

Privacy is also recognized by the Supreme Court of the United States as the interest protected by the Fourth Amendment's prohibition on unreasonable searches. *See Katz v. United States,* 389 US 347, 353, 88 S Ct 507, 19 L Ed 2d 576 (1967). Since *Katz,* the Court has defined a Fourth Amendment search as a government action that infringes upon a "reasonable expectation of privacy."[6] The state urges us to

---

[6] Although the phrase "reasonable expectation of privacy" is often attributed to *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967), that phrase nowhere appears in the opinion for the Court. The phrase was employed in Justice Harlan's concurring opinion, 389 US at 360, and was first used in an opinion for the Court in *Terry v. Ohio,* 392 US 1, 9, 88 S Ct 1868, 20 L Ed 2d 889 (1968). The Court has since used a number of apparently interchangeable variations of the phrase. *See, e.g., United States v. Jacobsen,* 466 US 109, 122-23 & n 22, 104 S Ct 1652, 80 L Ed 2d 85 (1984) ("an expectation of privacy that society is prepared to consider reasonable"; "an interest in privacy that society is prepared to recognize as reasonable"; a "legitimate expectation of privacy"; "a legitimate interest in privacy"). In *United States v. White,* 401 US 745, 786, 91 S Ct 1122, 28 L Ed 2d 453 (1971) (Harlan, J., dissenting), Justice Harlan himself criticized the Court's application of the phrase, which he believed was a misunderstanding of his *Katz* concurrence. `

adopt this definition, together with the Court's applications of it, for Article I, section 9. The state points in particular to *United States v. Knotts,* 460 US 276, 103 S Ct 1081, 75 L Ed 2d 55 (1983), and *United States v. Karo,* 468 US 705, 104 S Ct 3296, 82 L Ed 2d 530 (1984). In those cases, the Court held that monitoring the location of a radio transmitter, which had been surreptitiously attached to an object, was a search under the Fourth Amendment if the transmitter was in a "private place" such as a home, but not a search if the transmitter was in a "public place," including an automobile. The Court's rationale was that an individual has a "reasonable expectation of privacy" in the movement and location of an object only within "private places" that are not open to public view.[7]

■    This court has expressed doubts about the wisdom of defining Article I, section 9, searches in terms of "reasonable expectations of privacy." *See State v. Tanner, supra,* 304 Or at 321 n 7; *State v. Louis, supra,* 296 Or at 60. Because the phrase continues to appear so often in arguments, we here expressly reject it for defining searches under Article I, section 9. The phrase becomes a formula for expressing a conclusion rather than a starting point for analysis, masking the various sub-stantive considerations that are the real bases on which Fourth Amendment searches are defined. *See, e.g.,* Wilkins, *Defining the "Reasonable Expectation of Privacy": An Emerging Tripartite Analysis,* 40 Vand L Rev 1077 (1987). Moreover, the privacy protected by Article I, section 9, is not the privacy that one reasonably *expects* but the privacy to which one has a *right. See State v. Tanner, supra,* 304 Or at 321 n 7. The Supreme Court of the United States is not unaware of this difficulty, for it has stated that a "reasonable expectation of privacy" is an expectation of privacy that is "legitimate" or that "society is prepared to recognize as reasonable." *E.g.,*

---

[7] We note that there is no presumption that interpretations of the Fourth Amendment by the Supreme Court of the United States are correct interpretations of Article I, section 9. *See State v. Kennedy,* 295 Or 260, 265-67, 666 P2d 1316 (1983); *State v. Caraher,* 293 Or 741, 748-52, 653 P2d 942 (1982). Article I, section 9, and the Fourth Amendment have a common source in the early state constitutions, but they have textual and substantive differences. Even were the provisions identical, this court would nonetheless be responsible for interpreting the state provision independently, though not necessarily differently. Majority opinions of the Supreme Court of the United States may be persuasive, but so may concurring and dissenting opinions of that court, opinions of other courts construing similar constitutional provisions, or opinions of legal commentators. What is persuasive is the reasoning, not the fact that the opinion reaches a particular result.

*United States v. Jacobsen,* 466 US 109, 122-23, 104 S Ct 1652, 80 L Ed 2d 85 (1984). The definitional gloss, however, does not make the phrase any more useful for defining a search. Justice Harlan, who was responsible for originating the phrase "reasonable expectation of privacy" in his *Katz* concurrence, wrote four years later:

> "While [the "expectation of privacy"] formulations represent an advance over the unsophisticated trespass analysis of the common law, they too have their limitations and can, ultimately, lead to the substitution of words for analysis. The analysis must, in my view, transcend the search for subjective expectations or legal attribution of assumptions of risk. Our expectations, and the risks we assume, are in large part reflections of laws that translate into rules the customs and values of the past and present.
>
> "Since it is the task of the law to form and project, as well as mirror and reflect, we should not, as judges, merely recite the expectations and risks without examining the desirability of saddling them upon society. The critical question, therefore, is whether under our system of government, as reflected in the Constitution, we should impose on our citizens the risks of the electronic listener or observer without at least the protection of a warrant requirement." (Footnote omitted.)

*United States v. White,* 401 US 745, 786, 91 S Ct 1122, 28 L Ed 2d 453 (1971) (Harlan, J., dissenting).

We therefore turn to the substance of the state's arguments, shorn of their "reasonable expectation of privacy" packaging. The state, relying on *Karo* and *Knotts,* makes essentially two arguments, which are based on somewhat different factual premises. The first argument is that no privacy interest of defendant was infringed because the transmitter disclosed only what any member of the public could legitimately have observed. The second argument is that, even if the transmitter "enhanced" the observations of the police, defendant had no privacy interest outside "protected premises." Thus, the police engage in a search only if they monitor a transmitter while it is within "protected premises" such as a home.

We do not accept either the factual or the legal premise of the state's first argument. The state says in its brief, quoting *United States v. Knotts, supra,* 460 US at 281-82:

> "When defendant traveled over the public streets and onto the

driveways of other persons' property, he 'voluntarily conveyed to anyone who wanted to look the fact that he was traveling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto [someone else's] private property.' " (Bracketed material added by the state.)

The argument is factually unsound on the record before us, because the police, notwithstanding diligent efforts, found it impossible to follow defendant's automobile through visual surveillance. Indeed, their policy was not to use a transmitter unless visual surveillance had failed. Moreover, it is wrong to characterize the radio transmitter as simply a device for "enhancing" visual observations in the manner of moderate power binoculars or camera lenses. *Cf. State v. Louis, supra,* 296 Or at 61 (use of 135 mm camera lens not a search). The transmitter has nothing to do with vision; it broadcasts a signal that enables the police to locate, with little delay, the transmitter from anywhere that its signal can be received. Using the transmitter, police were able to locate defendant's automobile some 40 miles from where they expected to find it, and to do so they did not need to maintain constant surveillance of the transmitter or to follow a trail, as one would track a person by looking for footprints, broken branches, etc.

But even were we to accept the factual premise of the state's first argument, its legal premise is also unsound. That premise is that information legitimately available through one means may be obtained through any other means without engaging in a search.

■  The constitutional provisions against unreasonable searches and seizures do not protect a right to keep any information, no matter how hidden or "private," secret from the government. *Cf. State v. Weist,* 302 Or 370, 376-77, 730 P2d 26 (1986) (constitutional provisions do not limit warrants to evidence of crimes); ORS 133.535 (statutory specification of things subject to search and seizure); *Warden v. Hayden,* 387 US 294, 304, 87 S Ct 1642, 18 L Ed 2d 782 (1967) (rejecting contention that police may not search for and seize "mere evidence"). What the provisions forbid are unreasonable searches and seizures, *i.e.,* certain *acts* of the government. Article I, section 9, "presents the police with a web of rules that are meant to protect the privacy interests of 'the people,' and the police violate section 9 if and only if they violate these

rules." *State v. Tanner, supra,* 304 Or at 320. Whether police conduct is a search does not turn on whether its object could be discovered by conduct that is not a search. For example, in *State v. Louis, supra,* the defendant exposed himself to public view through his living room window. This court held that police officers did not engage in a search by photographing him from a house across the street with a 135 mm camera lens, which provided only minimal enhancement of what could be observed with the unaided eye. Nonetheless, the police officers would have engaged in a search had they entered his living room to observe what could be observed from the street. Similarly, if an undercover police officer is invited into a home and observes illegal conduct, the officer has not committed a search, but an unconsented entry into the home by other police officers to observe what the undercover officer could or did observe would be a search. The issue is not whether what the police learned by using the transmitter in this case was "exposed to public view," but whether using the transmitter is an action that can be characterized as a search.

The state's second argument does not rest on the factual premise that the police observed with the transmitter what any member of the public could have observed. The argument, rather, is that only government actions that observe conduct or objects within "protected premises" are searches, for, so the state argues, it is only within "protected premises" that an individual has a privacy interest protected by Article I, section 9. In making this argument, the state concedes that the transmitter at least "enhances" what members of the public can observe.

The state cites *State v. Louis, supra,* in support of its argument. After holding that police use of a 135 mm camera lens to take pictures of the interior of a house from a neighboring house was not a "search" under Article I, section 9, the court continued:

> "Such a case may not be made out, however, if objects or conduct *in protected premises* can be seen or overheard only by technologically enhanced efforts. A determined official effort to see or hear what is not plain to a less determined observer may become an official 'search.' " (Emphasis added.)

296 Or at 61. The state reads the italicized language in support

of its argument, but that is a misreading of *Louis,* as a quotation from a preceding paragraph makes clear:

> "Defendant was observed in his living quarters, which are the quintessential domain protected by the constitutional guarantee against warrantless searches. Application of the guarantee to people's 'houses,' Or Const, Art I, § 9, need not depend on also showing an 'expectation of privacy.' That phrase was employed in *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967), to extend personal Fourth Amendment protections beyond the areas literally protected by that amendment (in that case to a person using a public telephone booth), not to qualify the unquestioned protection afforded to private quarters."

296 Or at 60. This court's reference to "protected premises" in *Louis* was intended to affirm that the recognition of privacy as the fundamental interest protected against government searches did not qualify the protection traditionally accorded to "protected premises" such as houses under the older "constitutionally protected area" analysis for identifying "searches" under the Fourth Amendment and Article I, section 9. *Louis* did not imply that only government actions that learned something about the interior of "protected premises" could be searches.

For a half-century, the United States Supreme Court defined a Fourth Amendment search as a physical trespass to a "constitutionally protected area," *i.e.,* a physical trespass to those "areas" explicitly protected by the Fourth Amendment: persons, houses, papers, and effects. *See, e.g., Olmstead v. United States,* 277 US 438, 465-66, 48 S Ct 564, 72 L Ed 944 (1928) (telephone tap was not a search because the tap did not involve a trespass to a person, house, paper or effect). This definition of a search was long criticized for its narrow and arbitrary reading of the interests protected by the Fourth Amendment. *See* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn L Rev 349, 382 & n 316 (1974). With a growing recognition that privacy was the principal interest to be protected, the Court began to abandon the definition, *see, e.g., Jones v. United States,* 362 US 257, 266, 80 S Ct 725, 4 L Ed 2d 697 (1960); *Silverman v. United States,* 365 US 505, 511, 81 S Ct 679, 5 L Ed 2d 734 (1961), and eventually rejected it altogether in *Katz v. United States, supra.*

In *Katz,* FBI agents placed a listening device on the

outside of a public telephone booth. The device was not a wiretap and would ordinarily pick up only the words of the person in the booth. *Id.,* 389 US at 354 & nn 14-15. The defendant argued that use of the listening device violated his Fourth Amendment rights because a telephone booth was a "constitutionally protected area." The government argued that the booth was not a "constitutionally protected area," and that, in any event, the listening device was placed on the outside of the booth. The Court rejected the parties' formulation of the constitutional issue.

> "[T]his effort to decide whether or not a given 'area,' viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case. For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." (Footnote and citations omitted.)

389 US at 351-52.

◼ To be sure, the state does not ask us to go so far as to rule that there is no search without a physical trespass to "protected premises." But the notion that the interests protected against government searches by Article I, section 9, are limited to interests in certain "protected premises" is unsustainable given this court's repeated recognition of privacy as the principal interest protected against unlawful searches. *See State v. Tanner, supra,* 304 Or at 319; *State v. Owens, supra,* 302 Or at 206; *State v. Elkins, supra,* 245 Or at 288-92. Intrusions and technologically enhanced observations into "protected premises" infringe privacy interests protected by Article I, section 9, but the question whether an individual's privacy interests have been infringed by an act of the police cannot always be resolved by reference to the area at which the act is directed. *Cf. State v. Tanner, supra,* (search of home in which defendant had no possessory interest nevertheless violated defendant's privacy interests); *Katz v. United States, supra.*

With respect to the use of radio transmitters to locate objects and people, it is not even possible to ascertain whether the use is directed at a "protected premise" until after the

object or person is located. Learning the location of the object or person is, after all, the purpose of the device. This fact demonstrates another difficulty with the state's contention that police use of transmitter is a search only if the transmitter is in a "*protected premise.*" The constitution is addressed to the government. The rules laid down for the government by Article I, section 9, must be rules that the government is capable of following. *See State v. Tanner, supra,* 304 Or at 320. Using a transmitter is either a search or it is not. Whether using the transmitter is a search cannot depend upon the fortuity of where the transmitter happens to be taken by the person under observation. In order to decide whether the government has searched, we must look to the nature of the act asserted to be a search.

■     A privacy interest, as that phrase is used in this court's Article I, section 9, opinions, is an interest in freedom from particular forms of scrutiny. The interest is not one of freedom from scrutiny in general, because, if that were the case, any form of scrutiny would infringe a privacy interest and thereby be considered a search. A court has never held, for example, that a police officer engages in a search by making unaided observations from a public place, and an individual therefore cannot be said to have a constitutionally protected interest in freedom from such scrutiny.

Government scrutiny aside, individual freedom from scrutiny is determined by social and legal norms of behavior, such as trespass laws and conventions against eavesdropping. *See Katz v. United States, supra,* 389 US at 350-51; *United States v. White, supra,* 401 US at 786 (Harlan, J., dissenting); Gross, *The Concept of Privacy,* 42 NYUL Rev 34, 35-37 (1967). One explanation for the absence of a constitutionally protected interest against certain forms of government scrutiny may be the absence of any freedom from those forms of scrutiny in society at large. The reason that the observations of a police officer who is standing in a public place infringe no privacy interest may be that there is no generally recognized freedom from such scrutiny by private individuals. Such observations by the police would thus not significantly reduce the freedom from scrutiny available to "the people." In contrast, both laws and social conventions have long recognized the right to exclude others from certain places deemed to be

private. If the government were able to enter such places without constitutional restraint, "the people's" freedom from scrutiny would be substantially impaired.

Our intention is not to set forth a definition of search based upon social and legal norms of behavior but to clarify the nature of the interest protected by Article I, section 9. Social and legal norms cannot govern the scope of the constitutional provision, which itself plays a substantial role in shaping those norms. *See, e.g., United States v. White, supra,* 401 US at 786 (Harlan, J., dissenting). But since 1859, when Article I, section 9, was adopted, the government's ability to scrutinize the affairs of "the people" has been enhanced by technological and organizational developments that could not have been foreseen then. Tiny radio transmitters for surreptitiously locating objects to which the transmitters are attached are among these developments. In deciding whether government practices that make use of these developments are searches, we must decide whether the practice, if engaged in wholly at the discretion of the government, will significantly impair "the people's" freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on "unreasonable searches" set forth in Article I, section 9.[8] In this context, it is appropriate to recall what this court said in *State v. Robertson,* 293 Or 402, 434, 649 P2d 569 (1982): "Constitutional interpretation of broad clauses locks neither the powers of lawmakers nor the guarantees of civil liberties into their exact historic forms in the 18th and 19th centuries, as long as the extension remains true to the initial principle."

As we noted above, use of a radio transmitter to

---

[8] *Cf. United States v. White, supra,* 401 US at 786 (Harlan, J., dissenting) ("The critical question * * * is whether under our system of government, as reflected in the Constitution, we should impose on our citizens the risks of the electronic listener or observer without at least the protection of a warrant requirement."); 1 LaFave, Search and Seizure 313 (2d ed 1987) ("[T]he fundamental inquiry is whether [a government] practice, if not subjected to Fourth Amendment restraints, would be intolerable because it would either encroach too much upon the 'sense of security' or impose unreasonable burdens upon those who wished to maintain that security."); Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn L Rev 349, 403 (1974) ("The ultimate question * * * is whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society.").

locate an object to which the transmitter is attached cannot be equated with visual tracking. *See also* 1 LaFave, Search and Seizure § 2.7(d) (2d ed 1987). Any device that enables the police quickly to locate a person or object anywhere within a 40-mile radius, day or night, over a period of several days, is a significant limitation on freedom from scrutiny, as the facts of this case demonstrate. The limitation is made more substantial by the fact that the radio transmitter is much more difficult to detect than would-be observers who must rely upon the sense of sight. Without an ongoing, meticulous examination of one's possessions, one can never be sure that one's location is not being monitored by means of a radio transmitter. Thus, individuals must more readily assume that they are the objects of government scrutiny. Professor Amsterdam and Justice Harlan, among others, have observed that freedom may be impaired as much, if not more so, by the threat of scrutiny as by the fact of scrutiny. *See United States v. White, supra,* 401 US at 787-89 (Harlan, J., dissenting); Amsterdam, *supra,* at 402-03.

The problem presented by this case is essentially much like that presented in *Katz,* which was whether using a hidden listening device placed in a public place could be considered a search. Conversations in public may be overheard, but it is relatively easy to avoid eavesdroppers by lowering the voice or moving away. Moreover, one can be reasonably sure of whether one will be overheard. But if the state's position in this case is correct, no movement, no location and no conversation in a "public place" would in any measure be secure from the prying of the government. There would in addition be no ready means for individuals to ascertain when they were being scrutinized and when they were not. That is nothing short of a staggering limitation upon personal freedom. We could not be faithful to the principles underlying Article I, section 9, and conclude that such forms of surveillance were not searches.

■ We hold that the use of the radio transmitter to locate defendant's automobile was a search under Article I, section 9, of the Oregon Constitution. Because the police did not have a warrant to use the transmitter, and because no exigency obviated the need to obtain a warrant, use of the transmitter violated defendant's rights under Article I, section

9.[9] Accordingly, the circuit court properly suppressed all evidence obtained through use of the device.

Our disposition of this case makes it unnecessary to decide whether the Court of Appeals correctly held that the attachment and monitoring of the transmitter was a "seizure" under Article I, section 9. We also need not address defendant's Fourth Amendment arguments.

The judgment of the circuit court and the decision of the Court of Appeals are affirmed. The case is remanded to the circuit court for further proceedings.[10]

---

[9] In *United States v. Karo,* 468 US 705, 717-18, 104 S Ct 3296, 82 L Ed 2d 530 (1984), the Court addressed the government's concern that warrants for electronic tracking and locating devices would be impracticable because of the "exigencies" surrounding their use and because of the need to satisfy the particularity requirements of the Fourth Amendment. Article I, section 9, and ORS 133.565 also contain particularity requirements for warrants. Without necessarily endorsing the Court's statements in *Karo,* what it said there should in some measure address concerns that the state may have on this score.

[10] We note that defendant was on probation for burglary when the transmitter was used. Among the conditions of his probation was that he be subject to certain searches not involved in this case. Use of a locating transmitter to keep track of a probationer's movements may be constitutionally permissible without further justification if made a condition of probation. We express no opinion on that issue or on whether such a condition would be statutorily permissible under ORS 137.540. Our decision today also does not address the constitutionality of devices that have recently come into use for monitoring the location of persons sentenced to "house arrest."