Argued and submitted March 16, reversed and remanded August 11, 2004

# STATE OF OREGON,
*Respondent,*

*v.*

# CONRAD BRISCOE MUNRO,
*Appellant.*

020243; A120381

96 P3d 348

Andy Simrin argued the cause and filed the brief for appellant.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

SCHUMAN, J.

Edmonds, P. J., concurring.

**SCHUMAN, J.**

Defendant appeals his conviction for encouraging child sexual abuse in the second degree. He assigns error to the denial of his motion to dismiss that charge on statutory former jeopardy grounds and to the denial of his motions to suppress a videotape and its contents showing child pornography. We conclude that the court correctly denied his former jeopardy motion and his motion to suppress the videotape itself but that the court should have granted his motion to suppress the contents of the videotape. We consequently reverse and remand for a new trial.

In early June 2000, Clackamas County police officers received information that defendant was using marijuana with teenage boys in his apartment, selling them marijuana, and "grooming" the boys for sexual activity. After an investigation, Officer Andrews prepared an affidavit for a search warrant. The affidavit recited that he knew "from [his] training and experience" that "[p]ersons who possess and distribute marijuana and other controlled substances often keep records pertaining to their illegal narcotic activities. These include * * * video films[.]" It further recited that he had probable cause to believe that "evidence of the crimes of Possession of a Schedule I Controlled Substance, and Delivery of a Schedule I Controlled Substance," including "business records such as * * * videotapes" were located in defendant's apartment. Based on the affidavit, a judge issued a warrant authorizing the search of defendant's apartment for, among other things, videotapes. The warrant also authorized seizure of "the aforesaid objects of the search." The judge issued the warrant on June 9, 2000, and the officers executed it the same day. Although at the time that the officers applied for the warrant they had heard allegations of sexual activity involving defendant and a boy, the warrant application sought, and the judge granted, permission to search for evidence only of marijuana crimes, not sex crimes.

Pursuant to the warrant, officers searched defendant's apartment and seized, among other things, a Beta videotape, a dozen VHS videotapes, and some marijuana. When they subsequently tried to play the Beta videotape, it

appeared to be blank. They then returned it to the property room. Thereafter, in May 2001, defendant was charged with possession of a controlled substance. He was ultimately convicted on that charge in August 2001.

Meanwhile, on June 5, 2001, after defendant had been charged with the marijuana crime but before he was convicted, Sergeant Coates of the Clackamas County Sheriff's Department received information that the Beta videotape "probably [contained] child pornography." Without obtaining a new warrant, he attempted to view the videotape again, but again it appeared to be blank. Coates then took it to technicians at KOIN-TV. They, too, were unable to see anything on it, but they referred Coates to a shop in Gresham that succeeded in copying the content of the Beta videotape into VHS format. Coates then viewed the videotape and saw "what appeared to be young boys involved in sexual activity." The next month, police arrested defendant and he was charged with encouraging the sexual abuse of a child, ORS 163.686, on the theory that he possessed child pornography while knowing that its creation involved child abuse. He moved to dismiss the charge on statutory and constitutional former jeopardy grounds; the court denied that motion. He also moved to suppress the videotape and its contents; those motions, too, were denied. This appeal ensued.

■■ Defendant argues first that the court should have granted his motion to dismiss under ORS 131.515(2), which provides:

> "No person shall be separately prosecuted for two or more offenses based upon the same criminal episode, if the several offenses are reasonably known to the appropriate prosecutor at the time of commencement of the first prosecution and establish proper venue in a single court."

To succeed under this statute,[1] defendant must establish three elements: (1) the separate prosecutions were for two or more offenses that were part of the same criminal episode; (2) the offenses were known to the prosecutor when the first prosecution was commenced; and (3) venue was proper in a single court. *State v. Fore*, 185 Or App 712, 715, 62 P3d 400

---

[1] Defendant abandons his constitutional argument on appeal.

(2003). The trial court found as fact that the prosecutor did not know of the second offense when the marijuana prosecution began in May 2001. We are bound by that finding if any evidence in the record supports it. *State v. Knowles,* 289 Or 813, 823-24, 618 P2d 1245 (1980). Testimony indicates that the prosecutor did not learn of the child pornography on the videotape until late July 2001, over two months after prosecution of the marijuana charge commenced in early May. Even if we could impute the police officers' knowledge to the prosecutor, they did not learn of the pornography until June 2001—again, after the marijuana prosecution began. We therefore reject defendant's first assignment of error.[2]

■ Defendant next assigns error to the trial court's denial of his pretrial motion to suppress the Beta videotape. He argues that the affidavit in support of the warrant application to search defendant's apartment did not establish probable cause that videotapes containing drug transaction records would be found there.

■ This court's inquiry into the sufficiency of an affidavit supporting a search warrant involves two questions: "(1) whether there is reason to believe that the facts stated are true, and (2) whether the facts and circumstances disclosed by the affidavit, if true, are sufficient to establish probable cause to justify the search requested." *State v. Villagran,* 294 Or 404, 408, 657 P2d 1223 (1983). Here, there is no dispute about the first question; defendant withdrew his motion to controvert any of the statements in the affidavit. Accordingly, our inquiry is limited to whether the uncontroverted facts in the affidavit establish probable cause to search defendant's apartment. *State v. Goodman,* 328 Or 318, 325, 975 P2d 458 (1999).

"The probable cause requirement means that the facts upon which the warrant is premised must lead a reasonable person to believe that seizable things will probably be found in the location to be searched." *State v. Anspach,* 298

---

[2] We need not decide whether the two offenses—possession of marijuana and encouraging child sexual abuse—even though contemporaneous, were part of the "same criminal episode." *See State v. Boyd,* 271 Or 558, 565-66, 533 P2d 795 (1975) (charges arise out of same criminal episode if a complete account of one cannot be related without relating details of the other); *Fore,* 185 Or App at 715 (same).

Or 375, 380-81, 692 P2d 602 (1984). "When addressing probable cause issues in cases where a warrant was issued, we confine our analysis to a 'common-sense view of the affidavit' filed by the police officer." *State v. Moylett*, 313 Or 540, 552, 836 P2d 1329 (1992) (quoting *State v. Coffey*, 309 Or 342, 346, 788 P2d 424 (1990)).

Lieutenant Andrews of the Clackamas County Sheriff's Department prepared the affidavit in support of the search warrant. That affidavit contained substantial information about the sale of marijuana in defendant's apartment and included the following references to videotapes:

"I know from my training and experience the facts, practices and circumstances [that] are common to the delivery and possession of marijuana.

"* * * * *

"Persons who possess and distribute marijuana and other controlled substances often keep records pertaining to their illegal narcotic activities. * * * These records include written and electronically stored business documents, ledgers, address books, computer files and software, telephone toll records, notes, messages, photographs and *video films*, and encrypted memoranda indicating drug debts/sales."

(Emphasis added.) Because defendant withdrew his motion to controvert the affidavit, Andrews's assertions are uncontradicted and must therefore be accepted. Further, as the state points out, the statements have a reasonable basis in fact:

"It is far from unusual for defendants to have taken photographs of their drugs and/or their drug operations which serve as records of their criminal operations just as much as a ledger book does. For example, in *State v. Forseth*, the police found during a search of a house 'a photograph depicting defendant holding a small piece of glass with five rows of white powder on it. In the picture, defendant had a straw up to his nose, the other end of which touched the white powder.' 302 Or [233,] 235[, 729 P2d 545 (1986)]. In *State v. Maxfield*, 133 Or App 371, 373, 891 P2d 1342, *modified on recon*[,] 134 Or App 542, 896 P2d 581 (1995), the police were called by a photo store employee regarding two rolls of film the defendant had brought to be developed that 'depicted high-quality marijuana in a growing state,'

pictures of buildings and persons, two pictures of [the] defendant, and a picture of someone standing next to a U.S. Forest Service water-pumper truck. In *State v. Saude*, 95 Or App 428, 430, 769 P2d 784 (1989), the police found photographs during a search of the defendant with three others inside the garage containing a methamphetamine laboratory and defendant 'standing in front of the locked cabinets containing the methamphetamine production material.' It is not unusual at all for photographic records of drug crimes to be found at a defendant's residence."

Read in context and in a commonsense manner, the statements in the affidavit were sufficient to allow a reasonable person to infer that videotaped evidence of the crime of possession of a controlled substance would be found in defendant's apartment. Defendant's second assignment of error, therefore, lacks merit.

■ Finally, defendant argues that, even if police lawfully *seized* the videotape when they searched defendant's apartment, they performed an analytically separate act when they *viewed* the videotape; that act, according to defendant, constituted a search, and it violated Article I, section 9,[3] of the Oregon Constitution because no warrant authorized it and it did not fit within any exception to the warrant requirement. We agree.

■■ Initially, the state contends that, because officials lawfully seized the videotape pursuant to a warrant and lawfully retained custody of it, defendant no longer had any privacy right to its contents. That argument conflates two separate interests protected by Article I, section 9. That provision protects both possessory interests and privacy interests. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). Once the videotape was lawfully *seized*, defendant's *"possessory* interest in that property has been substantially reduced. The additional retention of the item, for the limited purpose of

---

[3] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

\* \* \* testing, is not a substantial interference with that *possessory* interest." *Id.* at 207 (emphasis added). However, "a 'search' occurs when a person's *privacy* interests are invaded," *id.* at 206 (emphasis added), that is, when the state deprives the person of freedom from unwanted scrutiny, *State v. Campbell*, 306 Or 157, 171, 759 P2d 1040 (1988). A defendant can lose his or her possessory interest in property without necessarily losing the accompanying right to freedom from unwanted scrutiny. In *State v. Binner*, 131 Or App 677, 683, 886 P2d 1056 (1994), for example, we held that the defendant retained his right to freedom from unwanted scrutiny of a blood sample in regard to which he had waived his possessory interest. Thus, the fact that officers lawfully seized the videotape does not imply that their subsequent viewing of it invaded no interest; if it was a search, it implicated defendant's privacy interest.

■ ■ We must therefore determine whether viewing the videotape constituted a search. Government action amounts to a search if "the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on 'unreasonable searches' set forth in Article I, section 9." *Campbell*, 306 Or at 171; *accord State v. Wacker*, 317 Or 419, 425, 856 P2d 1029 (1993) (quoting *State v. Dixson / Digby*, 307 Or 195, 211, 766 P2d 1015 (1988)). "One indication of whether a government action intrudes on a person's privacy right is whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995).

Defendant argues that, because the transfer of the videotape's content from Beta format to VHS format "disclosed to observation what was unobservable," Coates's actions constituted a search. We agree. If a private person had lawfully entered defendant's home and taken affirmative steps to view an unlabeled videotape without the owner's permission or knowledge, that conduct would obviously offend reasonable social norms. If state officials could do that whenever they wanted, we "the people" would lose a significant amount of our freedom from unwanted scrutiny. *See, e.g.,* *State v. Barnum*, 136 Or App 167, 173, 902 P2d 95 (1995),

*rev den*, 323 Or 336 (1996) (examination of a person's private papers constitutes a search).[4]

Further, the videotape was not the kind of closed container that so "announces its contents" that opening it does not invade a protected privacy right and thus does not constitute a search. *Owens*, 302 Or at 206; *State v. Kruchek*, 156 Or App 617, 621-22, 969 P2d 386 (1998), *aff'd*, 331 Or 664, 20 P3d 180 (2001) (discussing "announced contents" principle). The Beta videotape did not announce its contents to Coates; there is no evidence that the videotape was marked or labeled in a way that indicated that it contained child pornography. *Compare State v. Ready*, 148 Or App 149, 156, 939 P2d 117, *rev den*, 326 Or 68 (1997) (videotape labeled "kid porn from Larry—movies then stills").

The question before us, then, becomes whether viewing the videotape was an unlawful search, that is, one that was neither authorized by warrant nor justified under one of the exceptions to the warrant requirement. The only warrant in this case authorized police to search defendant's apartment for evidence related to the marijuana crimes; police did not seek permission to search for evidence of child sex abuse, nor did the judge authorize a search for such evidence. The state concedes that, when the police viewed the videotape, that is the evidence for which they were looking. The search, then, exceeded the scope of the warrant. Again, *Binner* is instructive. In that case, defendant consented to have his blood tested for alcohol but not for other substances. *Binner*, 131 Or App at 679. The sample revealed no alcohol. Around two weeks later, however, a second test revealed the presence of THC. *Id.* We affirmed the trial court's decision to suppress the results of the test for THC on the ground that, when he consented to the alcohol test, defendant did not necessarily also consent to the additional test, so a warrant or exception was necessary to justify it. *Id.* at 683. The same principle applies here. Just as consent carves away a limited portion of a person's privacy right, so too does a warrant, and in both

---

[4] Our conclusion does not imply that opening other data-containing items in different situations would necessarily be a search. A different social norm might apply to opening, for example, an unmarked notebook or photo album lying on a person's coffee table.

cases, the part of that right not voluntarily relinquished or involuntarily taken remains inviolate. As Judge Edmonds has observed,

> "[a] lawful seizure does not necessarily authorize a search of the seized article for all purposes. The reason for the seizure may circumscribe the scope of the search, whether the seizure is based on probable cause to search, *a search warrant* or the consent of the possessor."

*Barnum*, 136 Or App at 182 (Edmonds, J., concurring) (emphasis added). The warrant that police obtained in this case did not authorize viewing the videotape for the purpose of discovering child pornography.

 Nor does any other exception to the warrant requirement apply. Although it is certainly arguable that the information Coates obtained on June 5, 2001, gave him probable cause to search the videotape, no exigent circumstances required the police to act quickly to forestall the destruction, disappearance, or dissipation of evidence, *State v. Nagel*, 320 Or 24, 33, 880 P2d 451 (1994), because the videotape was lawfully in police custody. Nor was the content of the videotape in plain view. We conclude that the trial court erred in denying defendant's motion to suppress the content of the Beta videotape.

Reversed and remanded.

**EDMONDS, P. J.**, concurring.

I concur with the majority's reasoning and conclusions regarding defendant's motion to dismiss the charge against him on statutory former jeopardy grounds and his motion to suppress his videotape on the ground that the affidavit in support of the motion for a search warrant did not establish probable cause that it contained records of drug transactions. I also concur with the result reached by the majority that reverses the trial court's ruling denying defendant's motion to suppress the contents of the videotape. I write separately, to add to the reasoning that supports the majority's result.

Insofar as I can discern, the facts of this case frame an issue of first impression for Oregon appellate courts. The

videotape in question was seized and played pursuant to a lawful search warrant issued with regard to an investigation about controlled substances. However, defendant contends that an unlawful search occurred under Article I, section 9, of the Oregon Constitution when the police viewed the tape a year later without the benefit of a second search warrant after receiving information that it contained evidence of child pornography. The question framed by the facts is whether the "second look" by the police constituted a search within the meaning of Article I, section 9.

Article I, section 9, provides, in relevant part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" Not all forms of scrutiny by government agents implicate Article I, section 9. Rather, the nature of a privacy interest protected under Article I, section 9, is freedom from *particular forms* of government scrutiny or conduct. *State v. Campbell*, 306 Or 157, 170, 759 P2d 1040 (1988). In that connection, the *Campbell* court explained,

> "Government scrutiny aside, individual freedom from scrutiny is determined by social and legal norms of behavior such as trespass laws and conventions against eavesdropping. One explanation for the absence of a constitutionally protected interest against certain forms of government scrutiny may be the absence of any freedom from those forms of scrutiny in society at large. The reason that the observations of a police officer who is standing in a public place infringe no privacy interest may be that there is no generally recognized freedom from such scrutiny by private individuals. Such observations by the police would thus not significantly reduce the freedom from scrutiny available to 'the people.'"

*Id.* (citations omitted).

The majority relies chiefly on our holding in *State v. Binner*, 131 Or App 677, 886 P2d 1056 (1994). In *Binner*, the defendant expressly retained a privacy interest in his blood sample. He consented to have it tested for only one substance and did not consent to the sample being tested for other substances. Thus, the defendant relinquished his privacy interest in the sample only to a limited extent, thereby retaining his other interests from government scrutiny. There was no

"plain view" issue in *Binner* such as potentially exists here where the police were lawfully entitled to view the entirety of the contents of the videotape pursuant to the initial authorized search. Under the state's argument in this case, once the police viewed the tape pursuant to the authority of the warrant, all of the videotape's contents were exposed to plain view, thereby obviating any privacy interest in the contents of the videotape, unlike in *Binner*. It is that difference that causes me to believe that our reasoning in *Binner* does not resolve the issue in this case.

The majority also cites my concurring opinion in *State v. Barnum,* 136 Or App 167, 182, 902 P2d 95 (1995), *rev den*, 323 Or 336 (1996) (Edmonds, J., concurring). Relying on the reasoning in that opinion, the majority concludes that a lawful seizure does not necessarily authorize a search of the seized article for other purposes because the reason for the seizure may circumscribe the scope of the search and "[t]he warrant that police obtained in this case did not authorize viewing the videotape [for child pornography]." 194 Or App at 547. While I agree that the facts in *Barnum* are somewhat analogous to the facts in this case, the panel in *Barnum* decided that case on very different legal propositions.

In *Barnum*, the police opened the cover of a notebook, after observing the defendant writing in it, to confirm that the notebook contained sufficient material to constitute a handwriting exemplar. After the notebook was used as a handwriting exemplar by the crime lab, it was returned to the police who then looked at it without the benefit of a search warrant. The lead opinion held that, although exigent circumstances may have justified the initial warrantless invasion of the defendant's possessory interest in the notebook, they did not justify the initial warrantless invasion of the defendant's privacy interest in it. In its view, the police had to obtain a search warrant before the notebook could be opened to determine if it could function as a handwriting exemplar. *Barnum*, 136 Or App at 174-05. Judge Warren concurred in the lead opinion's result, but he would have concluded that the initial seizure was unlawful because the state had not demonstrated that the officers initially had probable cause to seize the notebook. *Id.* at 177 (Warren, J., concurring).

I disagreed with both conclusions. I would have held that the officers had probable cause to believe that the notebook contained the letter combinations needed to make a comparison with other handwriting samples in the possession of the crime lab, having seen the defendant write in it. However, the probable cause that arose from that observation was limited to the purpose that the defendant's act of writing announced to them. When the defendant wrote in the notebook in the presence of the officers, his act announced that the notebook contained his writing, but the substance or content that he wrote was not in plain view. The conduct that the officers observed provided them probable cause to believe that the notebook contained the letter combinations sufficient to constitute a handwriting exemplar. Combined with exigent circumstances, that probable cause provided the authority under Article I, section 9, to seize the notebook and examine it to confirm that it contained what the police had probable cause to believe was in it. Their limited examination did not infringe on any privacy interest of the defendant. *See Owens*, 302 Or 196, 206-07, 729 P2d 524 (1986). However, after the notebook had been used for purposes of handwriting comparison, it was returned to the police, and the state sought to enlarge the scope of the search without seeking a search warrant. On appeal, the state argued that, "[b]ased on the information they lawfully observed in plain view during the initial examination, the police were entitled to scrutinize the entire contents of the notebook more closely at any time they wanted." I concurred with the result reached by my colleagues because of my concern that upholding the conduct of the police would turn what had been an authorized search for a limited purpose into the kind of warrantless general search without probable cause prohibited by the constitution. *Barnum*, 136 Or App at 183-85 (Edmonds, J., concurring). Although my reasoning in *Barnum* helps to inform the analysis in this case, the most that can be said about *Barnum*, in terms of precedential value, is that it represents the views of three judges of this court who agreed on a result but not on the reasoning that led to the result.

The majority's analysis, however, that springs from the reasoning in the above cases deserves more discussion.

As I understand the majority opinion, it reasons that any subsequent search of the videotape for evidence of child pornography required the state to obtain a search warrant for that purpose because the police were searching for evidence of child pornography rather than evidence of controlled substances. I do not disagree with the general proposition that the purpose for which a search is authorized often circumscribes the scope of an additional search. What often must also be factored into the analysis, however, is the doctrine of "plain view" that becomes applicable because of some authorized government action. The purpose of this concurrence is to suggest an understanding about how "plain view" and privacy interests under Article I, section 9, interrelate for the consideration of law enforcement authorities and the bench and the bar.

What Article I, section 9, deems as an *unreasonable* search is government conduct that significantly reduces the freedom from government scrutiny available to members of the public. A search under Article I, section 9, occurs when a person's privacy interests are invaded. *Owens*, 302 Or at 206. Whether police conduct constitutes an unreasonable search does not depend on whether the object of the search could be discovered by conduct that is not a search but on whether the police conduct itself, if engaged in wholly at the discretion of the state, "will significantly impair 'the people's' freedom from scrutiny, for the protection of that freedom is the principle that underlies the prohibition on 'unreasonable searches' set forth in Article I, section 9." *Campbell*, 306 Or at 171 (footnote omitted). So, for instance, no warrant is required, and no search implicating Article I, section 9, occurs, when police can observe, feel, or smell the exterior of a container lawfully in the possession of the government and discern its contents thereby because, by its very nature, the information that is acquired is in plain view as if it existed outside the confines of the container. *Owens*, 302 Or at 206. When those principles are applied to the contents of an opaque container such as a videotape, it becomes apparent that, if the contents are lawfully exposed to inspection by others, they lose their characteristic as private effects under Article I, section 9, because they are in "plain view" as if they

existed outside the confines of the container. In other words, the antithesis of the privacy interest that inheres in a private, personal effect is a personal effect in plain view.

That understanding is further informed by the nature of privacy interests themselves. In *State v. Smith*, 327 Or 366, 373, 963 P2d 642 (1998), the Supreme Court discussed the relationship between private spaces and privacy interests and explained that "the privacy interests that are protected by Article I, section 9, commonly are circumscribed by the space in which they exist and, more particularly, by the barriers to public entry (physical and sensory) that define that private space." (Footnote omitted.) The barriers to public inspection of a videotape consist of the fact that it must be played before its content is in plain view. Here, however, the search warrant authorized the police to view the contents of defendant's videotape, or, in other words, to invade the barriers of the videotape that protected defendant's privacy interest. Suppose that the officers' initial exercise of their authority under the warrant to play the videotape had exposed its contents. The lawful exposure of the videotape's contents to the officers would have removed the barrier to public access virtually to the same extent as if they had been subject to plain view inspection by members of the public. Under those circumstances, a subsequent viewing of the videotape could not have constituted a search under Article I, section 9, because any privacy interest in the contents of the videotape would have been significantly impaired or destroyed by the prior lawful search, and such a privacy interest would have no longer existed.[1]

Other jurisdictions have reached similar conclusions under a reasonable expectation of privacy test.[2] Once an item has been seized in connection with a lawful search, courts

---

[1] If there was no identifiable privacy interest left in the videotape once the contents had been viewed by the police pursuant to the warrant, the issuance of a second warrant to protect a nonexistent interest would be meaningless.

[2] *See, e.g., United States v. Burnette*, 698 F2d 1038, 1049 (9th Cir), *cert den*, 461 US 936 (1983) (holding that, "once an item in an individual's possession has been lawfully seized and searched, subsequent searches of that item, so long as it remains in the legitimate uninterrupted possession of the police, may be conducted without a warrant"); *People v. Stewart*, 293 NE2d 169 (Ill App 1973); *Rudolph v. Commonwealth*, 474 SW2d 376 (Ky App 1971); *MacLaird v. State*, 718 P2d 41 (Wyo 1986); *see also* Searches and Seizures, 79 CJS 42-43 § 23 (1995).

have reasoned that requiring a warrant to conduct a second search, even to search for a different purpose, does not provide any additional protection of an accused's privacy. As one court said, "It is difficult to see how a lawful search and seizure becomes unreasonable when new information is received linking the property seized with a crime not known to the authorities initially." *MacLaird v. State*, 718 P2d 41, 45 (Wyo 1986); *see also United States v. Oaxaca*, 569 F2d 518, 523-24 (9th Cir), *cert den*, 439 US 926 (1978).

There are, however, additional facts in this case that must be considered. When the police first viewed the tape, they put it in a Beta machine, but the tape appeared blank as if it had been "used, recorded or erased, just without any picture, any content, nothing audible." After the police received information that the tape contained child pornography, they attempted to view it again; but when they played it, it still appeared blank as it had on the occasion when it was originally viewed. The police then took the videotape to KOIN-TV, which, according to the trial court's findings, had more sophisticated equipment. However, the court found that "[t]he efforts * * * were unavailing again; nothing seen but snow as though the tape was empty and devoid of any information." The police then contacted a video services business that provides duplicating of videotapes and other services. The trial court found that, by the use of "a more sophisticated analysis," the service "with a better qualified technician" was able to determine the speed at which the tape was recorded, and the existing Beta format was transferred to a VHS format. According to the record before us, Beta tapes are viewable only on Beta VCRs. Beta tapes can be recorded at three different speeds. Most Beta VCRs are capable of playing Beta tapes at any speed at which they are recorded. The video technician described the tape as being recorded "in a common beta format." It is those circumstances that inform the determination of whether defendant retained a privacy interest in the seized videotape.

Whether a privacy interest continues to exist in an object lawfully seized and in police custody will often depend on the nature of the object itself and social norms. The question is ultimately one of "reasonableness" under Article I, section 9. As electronic and scientific technology for recording

information continues to grow in leaps and bounds, this court will be faced with multiple and varied legal puzzles under Article I, section 9. For example, what should be the result if a computer file is lawfully seized to be searched for a particular purpose, but information pertinent to a different criminal investigation is discovered therein, either during the initial search or during a subsequent search? When will an additional search warrant be necessary before police may use software or other techniques to "decode" information that is contained in the contents of a computer file? There are no easy answers to these kinds of queries. In sum, where to draw the line between privacy interests and the "plain view" doctrine ultimately will have to be sorted out on a case-by-case basis based on the concept of reasonableness because Article I, section 9, prohibits only "unreasonable" searches and seizures.

In considering the issue of the reasonableness of the officers' conduct in this case, I found it helpful to think about the following questions: (1) Did the search warrant in this case give the officers the authority to search the videotape a second time for evidence of child pornography? The answer must be "no" because their authority to search was circumscribed by the purpose for which the warrant was issued, to search for evidence of controlled substances. (2) Were the contents of the videotape revealed when the officers initially played the videotape pursuant to the authority granted by the search warrant? The answer must be "no" because all the officers saw on that occasion was a blank tape; no contents were in "plain view." (3) Could the officers check the contents of the videotape to confirm what they had probable cause to believe it contained, *i.e.*, child pornography, without the benefit of a search warrant? The answer must be "no" because that principle applies when contents of an opaque container become perceptible virtually to the same extent as if they had been perceived outside the confines of the container's barriers. *Owens*, 302 Or at 206.[3] Here, it could not be discerned that there were contents of the videotape without the additional measures taken by police through the services of the

---

[3] This is not a case to which the probable cause and exigent circumstances exception to section 9's warrant requirement is applicable; the videotape had been in police custody for months.

video business. (4) Does this case fall into the category of cases where the government is simply conducting additional tests on a perceived object in its custody that does not result in a significant interference with a privacy interest? For instance, suppose the police had observed content on the tape pursuant to a lawful search that had been written in an ancient Chinese language, and they merely decode or translate the perceptible content of the tape or computer file. Would the police conduct under those circumstances constitute a significant interference with a privacy interest inasmuch as the content itself was visible, but not understood? In contrast, this case appears to fall into a different category of cases because the tape appeared blank when the officers first observed it. (5) Did the use of the Beta format operate as a greater barrier to government scrutiny than if the videotape had been in VHS format? Based on the evidence before us, the answer to that question is probably "yes" in light of the initial inability of the police to discern whether there was content on the videotape. (6) Was defendant's asserted privacy interest ever lost or destroyed throughout the sequence of events in this case? The answer to the last question is the ultimate and most difficult one.

The state argues that the fact that the police did not view the videotape in the correct format on the first occasion in order to see what could have been discerned is an inconsequential fortuity. According to the state, because the videotape was in the lawful custody of the police and because police had played the tape, defendant lost all privacy interests in it. After all, the state argues, Article I, section 9 does not limit the police to the use only of evidence discovered during an initial examination of a seized object. Therefore, in its view, the examination thereafter of the videotape for any purpose did not constitute a significant intrusion of constitutional proportions into defendant's privacy interest or an "unreasonable" search.

The problem with the state's argument is the problem that existed in *Barnum*. To accept the state's argument is to turn what began as an authorized limited search (a search reasonable in scope) into authority for a general search (a search unreasonable in scope) without the authority of an magistrate or a judge. "Reasonableness" of the scope of a

search will always be defined by the facts of a particular case. Here, the crucial facts regarding "reasonableness" are the purpose for which the initial search warrant issued, the fact that the police saw only a blank tape when they exercised their lawful authority to look at the tape, and the efforts that it took to discover the existence of the contents of the tape. Had the police played the tape at the correct speed when they viewed it on the first occasion, the evidence of child pornography might have been in "plain view." But, as a matter of fact, it was not. It follows that the "plain view" doctrine, in my opinion, cannot operate constitutionally in this case to expand the scope of the search authorized by the warrant and that the state's subsequent search was "unreasonable" because it invaded defendant's privacy interest in the videotape.

So what are the lessons to be learned from this case? For the police and prosecuting attorneys, the lesson is clear that, whenever a search is undertaken of an object in police custody for purposes of a different criminal investigation, the safe course of action is to apply for an additional search warrant. For courts that have to decide these kinds of issues, it is to consider the import of all the facts as they bear on the issue of privacy interests and plain view in the line-drawing endeavor between reasonableness and unreasonableness under Article I, section 9, *and* to articulate why, in the court's opinion, a particular result is dictated. Undoubtably, the collision between Article I, section 9, and modern technology will continue to occur in the future. The law in this area is not settled; rather, it is in "process." An expression of reasoning by every court confronted with these kinds of issues will result in a contribution to a body of law that will eventually define for the public and the law enforcement community the import of Article I, section 9, in the area of electronic recording. Accordingly, I offer my suggested analysis.