414

Argued and submitted October 16, conviction for unlawful possession of a fire-
arm reversed and remanded; otherwise affirmed December 26, 2013

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAVID AUBREY WOLF,
*Defendant-Appellant.*

Grant County Circuit Court
1109268CR; A150380

317 P3d 377

Andrew D. Robinson, Deputy Public Defender, argued
the cause for appellant. With him on the brief was Peter
Gartlan, Chief Defender, Office of Public Defense Services.

Rebecca M. Auten, Assistant Attorney General, argued
the cause for respondent. On the brief were Ellen F.
Rosenblum, Attorney General, Anna M. Joyce, Solicitor
General, and Rebecca M. Johansen, Assistant Attorney
General.

Before Ortega, Presiding Judge, and Sercombe, Judge,
and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

The statute that defines "the crime of unlawful possession of a firearm" generally prohibits, among other acts, the carrying of concealed firearms. ORS 166.250(1)(a). The statute also creates exceptions to that general prohibition, including an exception that allows adult citizens to carry concealed handguns in their "place[s] of residence" and "place[s] of business" without obtaining a permit or license to do so. ORS 166.250(2)(b).[1] In this case, a jury convicted defendant of one count of unlawful possession of a firearm, based on the state's assertion that defendant had "unlawfully and knowingly carr[ied] a firearm concealed upon [his] person" in violation of ORS 166.250(1).[2] Defendant appeals the judgment of conviction, challenging the trial court's refusal to deliver his requested jury instruction on the "place of residence" exception to the general prohibition against carrying concealed firearms. Defendant contends that he was entitled to have that instruction given because the jury could have inferred from evidence in the record that he was within his "place of residence" when he carried the concealed pistol at issue. For the reasons set out below, we reverse and remand for further proceedings.

When a defendant challenges a trial court's refusal to give a requested jury instruction, we view the facts in

---

[1] ORS 166.250 provides, in part:

"(1) Except as otherwise provided in this section or ORS 166.260, 166.270, 166.274, 166.291, 166.292 or 166.410 to 166.470 or section 5, chapter 826, Oregon Laws 2009, a person commits the crime of unlawful possession of a firearm if the person knowingly:

"(a) Carries any firearm concealed upon the person;

"* * * * *

"(2) This section does not prohibit:

"* * * * *

"(b) Any citizen of the United States over the age of 18 years who resides in or is temporarily sojourning within this state, and who is not within the excepted classes prescribed by ORS 166.270 and subsection (1) of this section, from owning, possessing or keeping within the person's place of residence or place of business any handgun, and no permit or license to purchase, own, possess or keep any such firearm at the person's place of residence or place of business is required of any such citizen. As used in this subsection, 'residence' includes a recreational vessel or recreational vehicle while used, for whatever period of time, as residential quarters."

[2] The jury acquitted defendant of four counts of menacing.

the light most favorable to giving that instruction. *State v. Cossette*, 256 Or App 675, 676, 301 P3d 954 (2013). We summarize the facts of this case with that standard in mind, focusing on the evidence related to the unlawful-possession conviction.

In August 2011, defendant rented a campsite at the North Fork John Day Campground, planning to stay for a week. Defendant's campsite was about 30 feet away from the campsite used by the camp host, who testified at trial, and was about the same distance away from at least two other campsites. Defendant had a vehicle and a tent at his campsite. He also had brought a dredge to the campground, which he planned to use for mining in the river. The camp host engaged defendant in conversation because he did not believe that defendant could lawfully dredge at that time and place. Defendant asserted that he had a permit to engage in dredging and displayed "some papers" to the camp host, who testified he did not read the documents "because [he did not] understand them anyway." Because it appeared that defendant intended to go forward with the dredging, the camp host "called dispatch" to request that somebody come to the campsite and explain the law to defendant. Defendant then retrieved a rifle from his vehicle and assembled it while he watched the camp host and other people in the area; when he finished assembling the rifle, he put it inside his tent. The camp host then made another radio call, requesting that law enforcement officers come to the campground.

Forest Service officer Ross responded to the camp host's call. As he drove into the campground, he saw defendant standing next to his tent and his vehicle. Defendant's tent was a dome tent about four feet tall. Ross saw a rifle in the tent's doorway, and he testified that a sleeping bag and, possibly, a chair also were inside. Ross secured the rifle and unloaded it, then put it on defendant's vehicle. He then asked defendant, who was standing outside of the tent, who he was and whether "he had any other weapons on him." Defendant indicated that he had a pistol in his right front pocket. Ross took that firearm, which had been concealed, and unloaded it. He then asked defendant whether he had a permit to carry the concealed pistol, as it had not been "in

the open or in a holster or anything."[3] Defendant responded that he did not need a permit for the pistol, but he did not elaborate. The entire conversation between defendant and Ross took place at defendant's campsite. Ross eventually concluded that defendant had the permits that would allow him to engage in his planned dredging activities.

Forest Service officer Bland also responded to the call; by the time he arrived, Ross already was at the campground and had secured defendant's weapons. Bland engaged defendant in conversation while Ross took witness statements. Defendant asked Bland a few times "what was going on," and Bland explained that he and Ross had received a complaint about defendant having frightened other people at the campground when he assembled the rifle. Defendant talked about his dredging plans, and he and Bland also discussed other topics, including dogs and hunting.

At trial, defendant testified in his own behalf, asserting that he believed that he had not needed a license to carry the concealed pistol in his pocket because he had been on what he described as his "own rented property" at the campsite and had remained within its confines whenever he had the pistol on his person. He also testified that, at some point before officers arrived, he had made a pot of coffee.

After both parties rested, the trial court and lawyers conferred about jury instructions. The state requested (and the court eventually delivered) the uniform instruction related to the charge of unlawful possession of a firearm. That instruction states, in part, "Oregon law provides that a person commits the crime of unlawful possession of a firearm if that person knowingly carries any firearm concealed upon his person."

In accordance with his theory that his campsite had been his place of residence, defendant requested the following additional jury instruction:

"You are instructed that any citizen of the United States over the age of 18 years who resides in or is temporarily

---

[3] Under ORS 166.250(3), firearms that are "carried openly in belt holsters are not concealed" for purposes of the general prohibition against carrying concealed firearms.

sojourning within this state may own, possess or keep concealed on his person a firearm within the person's place of residence.

"'Residence' includes any temporary residence, recreational vessel or recreational vehicle while used, for whatever period of time, as residential quarters."

The parties and the trial court discussed the parties' proposed jury instructions in an off-the-record session, during which the court decided that it would not deliver defendant's requested "place of residence" instruction. The court subsequently summarized its ruling on the record, reasoning that the campsite area outside of defendant's tent did not meet the statutory definition of residence. The court acknowledged the interesting legal issue involved, noting that it would have reached the opposite conclusion if defendant had been inside his tent when he carried the concealed firearm. As we understand it, the court's decision not to give defendant's requested instruction was based on a ruling that, as a matter of law, the only portion of defendant's campsite that could constitute his "place of residence" was the area inside his tent. The state did not argue, and the trial court did not rule, that the requested instruction did not accurately describe the law in any other respect.

After the court instructed the jury, defendant excepted to the court's decision not to deliver his requested instruction:

"Yes. Well, the argument is that, certainly, if the residence we're talking about is a home, a structure, and someone ordinarily would have the right to carry a concealed weapon within his house or in his backyard, within the curtilage of that property, and if that is a rented property, similarly he would have the right to do that inside of his home.

"And the *Leslie* case [*State v. Leslie*, 204 Or App 715, 132 P3d 37, *rev den*, 341 Or 245 (2006)] involved a person who was actually living temporarily, although for about a year, I think it was, in the back of his truck, and he had a concealed weapon in the truck, and the Court of Appeals said that this was his residence.

"And in the instant case, what we have is [defendant], who had rented a camping space. His truck was there, his

tent was there, and for a week, that was going to be his residence.

"His kitchen was outside over the fire. He would have a folding chair. That would have been his living room. That would be the argument, anyway. So I would suggest that * * * the entire camp space, not the campground, but that space that he had rented, is his residence."

As noted, the jury convicted defendant of unlawful possession of a firearm.

On appeal, defendant assigns error to the court's refusal to give his requested "place of residence" jury instruction. "Generally speaking, a criminal defendant is entitled to a jury instruction if the instruction 'correctly states the law,' the instruction is 'based on [the defendant's] theory of the case[,]' and the record includes evidence supporting that theory." *Cossette*, 256 Or App at 680 (quoting *State v. Baty*, 243 Or App 77, 83, 259 P3d 98 (2011)) (bracketed material in *Cossette*).

Defendant argues that his requested jury instruction correctly stated the law as established by ORS 166.250(2)(b), which defines the place of residence exception to the general prohibition against carrying concealed firearms, and *Leslie*, in which we held that the defendant's canopied pickup truck was his place of residence because he had "actually live[d]" there for several years. 204 Or App at 723. Defendant emphasizes our explanation in *Leslie* that, for purposes of ORS 166.250(2)(b), a person's "place of residence,"—*i.e.*, where the person actually lives—is the place where "he or she regularly eats, drinks, and sleeps." *Id.* In this case, defendant argues, evidence in the record supports his theory that he actually lived at his campsite, "including its unenclosed areas," because he would have regularly engaged in daily living activities, like eating, drinking, and sleeping, in the campsite during the week that he planned to spend there. Defendant asserts both that he would have engaged in at least some such activities in the unenclosed areas of the campsite and that, in all events, the unenclosed campsite areas were sufficiently close to the areas in which he would conduct those activities (*e.g.*, the tent in which he presumably might have slept) to be considered part of his place of residence.

In response, the state first contends that the record did not include evidence that would have allowed the jury to determine that defendant was at his place of residence when he possessed the concealed firearm. In that regard, the state first argues that no portion of the campsite—not even the tent—could have been defendant's place of residence because, in the state's view, "it was not the place where he actually lived." That is so, the state argues, because defendant only "planned to camp" at the campground "for about a week, and presumably planned to return to his actual residence once he was finished." The state acknowledges that it did not make that argument to the trial court, but contends that its new argument demonstrates that the trial court's ruling was "right for the wrong reason."

We will not affirm on a "right for the wrong reason" basis unless, among other things, "the record materially [is] the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 660, 20 P3d 180 (2001).[4] The state's new argument does not satisfy that requirement. As the state clarified at oral argument, its new theory is premised on the idea that, by using the word "camping" in his testimony, defendant necessarily suggested that he was using the campsite only for temporary recreational purposes and had some other, more permanent, "actual residence." The record provides little or no support for that assumption, and the record might have developed differently had the state argued to the trial court that a person who has a permanent "actual residence" does not also have a different, temporary, "place of residence" when he or she stays at a campground for a week. For example, the parties might have offered evidence showing that defendant either had a permanent residence other than the

---

[4] Because we do not reach the merits of the state's "right for the wrong reason" argument, we—like the court in *Leslie*—"need not determine in what circumstances, other than those described in the 'recreational vehicle' and 'recreational vessel' provision, a person might have more than one 'place of residence' for purposes of ORS 166.250(2)(b)." *Leslie*, 204 Or App at 723 n 7. And because the parties have not litigated whether a one-week stay is sufficiently long to establish a "place of residence," we also "need not attempt to determine in this case whether there is any minimum legally sufficient period of 'actual residence' for purposes of ORS 166.250(2)(b)." *Id.*

North Fork John Day Campground or, conversely, that he had no long-term residence, but routinely traveled from one campsite to another, staying in each for a relatively short time. Because the record might have developed differently had the state argued below that the campsite was not defendant's "actual residence," we will not affirm on that basis.[5]

The state makes a second argument, which echoes the trial court's ruling: that, even if defendant's tent was his place of residence, the unenclosed areas of his campsite were not. According to the state, "the legislature intended to permit individuals to possess concealed weapons only inside the physical enclosure of their home—here, defendant's tent—rather than the surrounding area." As noted, defendant argues for a broader construction of "place of residence," suggesting that the term encompasses any location in which a person establishes a home, even if it is outdoors.

*Leslie* guides our analysis. In that case, we focused on the *functional* meaning of "place of residence" as used in ORS 166.250(2)(b), explaining that the term encompasses more than just "fixed and permanent" structures and more than individuals' legal residences. 204 Or App at 722-23. Because a person's "place of residence" is where the person

---

[5] The state did not argue below that defendant's proposed jury instruction incorrectly stated the law. Nor does the state argue, on appeal, that we should affirm on the basis that the proposed instruction incorrectly stated the law. At most, the state suggests in a footnote that the instruction was confusing and "*arguably* * * * incorrect" because it did not include an allegation that "a residence, even if temporary, must be the place where one actually lives." (Emphasis added.) We decline to affirm on the basis of that passing suggestion because (1) it does not purport to establish that the proposed instruction inaccurately described the law, but only suggests that an *additional* instruction might have been helpful if defendant's instruction was given; (2) the trial court never reached the point of needing to determine whether defendant's requested instruction was complete in all respects, as it rejected the instruction at an earlier stage in the analysis, having determined that under *no* circumstances could the place in which defendant had possessed his concealed pistol (the unenclosed areas of his campsite) be considered his place of residence; and (3) as noted, the state does not ask us to affirm on that alternative basis. Given that constellation of circumstances, we decline to exercise any discretion we might have to affirm on the basis that defendant's proffered instruction did not completely describe the applicable law, and we express no opinion on whether, in fact, the instruction was deficient in that respect. *See Outdoor Media Dimensions Inc.*, 331 Or at 659-60 ("the 'right for the wrong reason' principle permits a reviewing court—as a matter of discretion—to affirm the ruling of a lower court on an alternative basis when certain conditions are met").

"actually lives, *i.e.*, where he or she regularly eats, drinks, and sleeps," we held, the defendant's truck was his "place of residence" because he regularly engaged in such daily living activities there. *Id.* Thus, the inherently mobile nature of a truck did not preclude it from being a "residence" for purposes of ORS 166.250(2)(b).

As an initial matter, we see no material difference between the truck in *Leslie* and defendant's tent in this case. Both are structures, even if not "fixed and permanent," in which daily living activities may be conducted and, therefore, both can function as a person's "place of residence." The remaining question is whether areas outside of such structures also can be encompassed within a person's "place of residence." As explained below, we conclude that, if those outdoor areas form part of the place in which a person "actually lives," they are part of the person's place of residence.

"When construing a statute, we examine the text of the statute in context, along with any relevant legislative history, to discern the legislature's intent." *State v. Thomas*, 257 Or App 770, 772, 308 P3d 270 (2013). Here, that task requires us to determine the intent of the 1925 legislature, which enacted the statute that created the "place of residence" exception to the general prohibition against the unlicensed carrying of concealed firearms. *See Leslie*, 204 Or App at 719 (discussing statute's history). In this instance, our consideration of the statute's history is limited to reviewing the historical development of statutes regulating the carrying of concealed weapons, as that development culminated in the 1925 enactment, because "any legislative history concerning the scope of ORS 166.250(2)(b) was lost in the 1935 State Capitol Building fire." *State v. Perry*, 165 Or App 342, 350, 996 P2d 995 (2000), *aff'd*, 336 Or 49, 77 P3d 313 (2003). That history has been summarized as follows:

> "First, in 1885, the legislature imposed an outright ban on the carrying of concealed weapons by persons other than law enforcement officers. By later enactment, the legislature allowed for the carrying of concealed weapons on receiving a license. The 1925 statute created an exception to the general license requirement for persons in their place of residence or place of business. Those statutes, read together, reveal the intent of the legislature to carve out a

limited and specific exception to the requirement of obtaining a license to carry a concealed weapon."

*State v. Perry*, 336 Or 49, 56, 77 P3d 313 (2003).

We acknowledge that, as explained in *Perry*, the way in which the ORS 166.250(2)(b) exceptions developed shows that those exceptions are "limited and specific." *Id.* Nonetheless, ORS 166.250(2)(b) also reflects the legislature's general desire to allow people to "own, possess[, and] keep" concealable weapons to protect themselves in their homes, without the need to obtain a permit or license. ORS 166.250(2)(b). And the legislature specifically intended that right to extend to people who are temporary sojourners in Oregon, *i.e.*, travelers. ORS 166.250(2)(b); *Leslie*, 204 Or App at 722-23. Indeed, "the inclusion and maintenance of protection for the 'place of residence' of even those persons 'temporarily sojourning' within this state powerfully evinces a legislative intent to permit persons to possess concealed weapons where they live." *Leslie*, 204 Or App at 723. We discern nothing in the statute's text or historical development suggesting that the legislature did not also intend to extend that statutory right to the outdoor living areas of people's homes.

Indeed, the 1925 legislature's use of the term "place of residence" suggests an intent *not* to confine the right to the interiors of houses and other residential *structures*. At that time, Oregon statutes included several provisions related specifically to buildings and other structures. For example, the most serious form of burglary occurred when a person would "break and enter any dwelling house in the night-time, in which there [was] at the time some human being, with intent to commit a crime therein." Oregon Laws, title XIX, ch III, § 1941 (1920). A building was deemed to be a "dwelling house," for purposes of the burglary statutes, "any part of which [had] usually been occupied by any person lodging therein at night, and any structure joined to and immediately connected with such building." Oregon Laws, title XIX, ch XI, § 2390 (1920); *see also* Oregon Laws, title XIX, ch II, § 1909 (1920) (providing that a person's killing of another human being would be considered justifiable if committed "[t]o prevent the commission of a felony $***$

upon or in any dwelling house where such person may be"). The legislature focused even more specifically on structures when it defined lesser forms of burglary, such as the type that occurred when a person broke into and entered "any building within the curtilage of any dwelling house, but not forming a part thereof" or any "structure or erection in which any property is kept," including a "booth, tent, railroad car, vessel, [or] boat." Oregon Laws, title XIX, ch III, § 1943 (1920).

The existence of those statutes in the early 1900s demonstrates that the legislature knew how to, and sometimes did, enact legislation specifically limited to acts that take place *inside* residential or other structures when it intended the laws to apply only in those areas. The legislature easily could have employed similar terms when describing the area in which a person could permissibly carry a concealed weapon without a license, but it did not. That is, the legislature did not limit that right to "dwelling houses," other "building[s] within the curtilage of any dwelling house," or any other kind of structure. Rather, it employed the more general term "place of residence" which, as we already have held, is a *functional* term that refers to the place where a person actually lives, *i.e.*, regularly conducts living activities like eating, drinking, and sleeping. *Leslie*, 204 Or App at 723.

Based on the legislature's choice not to employ a specific, structure-related term like "dwelling house"—and given the legislative intent to permit people to possess concealed weapons where they actually live, for the purpose of protecting themselves in their homes—we conclude that the term "place of residence," as used in ORS 166.250(2)(b), can include outdoor living areas that are encompassed within the "place" in which a person regularly eats, drinks, and sleeps. We need not decide, in this case, how far away from the core residential area that "place" may extend. *Cf. State v. Dixson/Digby*, 307 Or 195, 210, 766 P2d 1015 (1988) (noting that, at common law, the concept of curtilage "provide[d] a zone of protection to sleeping residents from the 'midnight terror' of burglary"). At the very least, any areas that are *themselves* regularly used for those daily living activities form part of the person's place of residence.

Given that understanding of the law, defendant's entitlement to a "place of residence" jury instruction depended on whether the record included evidence from which jurors reasonably could infer that defendant regularly would have conducted daily living activities in a "place" that incorporated the outdoor areas of his campsite. We conclude that the record included sufficient evidence to support such an inference. First, the witnesses' testimony suggested that defendant's campsite covered a relatively small, defined area—a location that one could think of as a specific "place"—as the site was located in an established campground, only about 30 feet away from each of three other campsites. Second, the record includes evidence supporting an inference that defendant regularly would have engaged in daily living activities within the unenclosed areas of that "place." Defendant testified that he had rented the campsite and intended to stay there for a week. Although the record does not include evidence about the specific amenities associated with defendant's campsite, it does establish that a large stack of firewood (possibly four feet tall) was located between defendant's campsite and one of the others, and that a picnic table was located on at least one other campsite. A jury could reasonably infer from that evidence that some sort of outside seating arrangements also would have been located at defendant's campsite and that fire pits or rings were available. In addition, defendant testified that he made a pot of coffee before officers arrived at the campground, an act that jurors reasonably could believe defendant would have performed outside of his tent, *i.e.*, in the unenclosed areas of his campsite.

In sum, jurors could have inferred from evidence in the record that defendant regularly would have engaged in daily living activities in the unenclosed areas of his rented campsite and, therefore, that those areas formed part of defendant's "place of residence" while he was staying at the campground. Accordingly, defendant was entitled to have the jury instructed on the "place of residence" exception to the general prohibition against carrying concealed firearms.

Conviction for unlawful possession of a firearm reversed and remanded; otherwise affirmed.