Argued and submitted September 30, 2013, affirmed February 11, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GREGORY JAMES TEGLAND,
*Defendant-Appellant.*

Multnomah County Circuit Court
101134266; A148797

344 P3d 63

Meredith Allen, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

---

\* Haselton, C. J., *vice* Wollheim, S. J.

HASELTON, C. J.

**HASELTON, C. J.**

Defendant appeals a judgment of conviction for one count of possession of methamphetamine, ORS 475.894, and one count of erecting a structure on a public right of way, in violation of Portland City Code (PCC) 14A.50.050. He assigns error to the trial court's denial of his motion to suppress evidence found after a police officer lifted a tarp to defendant's makeshift shelter that partially blocked a public sidewalk. We conclude that the officer's action did not effect an unlawful search in that defendant had no constitutionally protected privacy interest associated with the structure. Accordingly, we affirm.

We review the trial court's ruling on the motion to suppress for legal error and are bound by the trial court's findings of historical facts "if there is constitutionally sufficient evidence in the record to support those findings." *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Where the trial court has made no express findings on disputed issues of fact, "we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Id.*

Defendant was homeless at the time of his arrest. Using the recessed alcove of an entrance to a private business building located in southeast Portland, defendant had built a shelter out of a grocery cart, a wooden pallet, and multiple tarps. The tarps covered the top of the shelter and the sides of the shelter and were attached to the building door, as well as to other parts of the alcove area. The shelter extended out onto the public sidewalk about two feet—roughly one-quarter of the width of the sidewalk.

On November 14, 2010, at about 9:00 a.m., Portland Police Officers Kofoed and Lowry were on patrol together and saw defendant's structure blocking part of the public sidewalk. The officers had seen other makeshift structures in the same location before, built and inhabited by various people, and the officers had removed such structures in the past. They had seen defendant there a week earlier and, at that time, they told him that he needed to remove his structure.

On the morning of defendant's arrest, the officers approached the structure to "see if there was anyone there" and, "because it was blocking the sidewalk, * * * we were thinking about removing it." Because the tarps covered the structure's sides, the officers could not see anything that was inside the structure, except for defendant's feet and some bedding. Kofoed lifted one of the tarps to peer inside the structure, and Lowry saw defendant with a glass methamphetamine pipe and a lighter. The officers arrested defendant for violating the city's code against erecting a structure on a public right of way, PCC 14A.50.050[1] and, in the process of that arrest, the officers found further evidence that led to defendant's arrest for possession of methamphetamine. Defendant was eventually charged with one count of each offense.

In a pretrial motion, defendant moved to suppress all evidence of Lowry's observations after lifting the tarp to the structure and all evidence derived from those observations. Defendant argued that Kofoed's action constituted an unreasonable search under both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The trial court, although determining that the structure was defendant's "residence," denied the motion to suppress:

"[M]y legal conclusion is that lifting of the tarp flap did not constitute an unlawful search.

---

[1] PCC 14A.50.050 provides:

"A. It shall be unlawful to erect, install, place, leave, or set up any type of permanent or temporary fixture or structure of any material(s) in or upon non-park public property or public right-of-way without a permit or other authorization from the City.

"B. In addition to other remedies provided by law, such an obstruction is hereby declared to be a public nuisance. The City Engineer, City Traffic Engineer, or Chief of Police may summarily abate any such obstruction, or the obstruction may be abated as prescribed in Chapter 29.60 of this Code.

"C. The provisions of this Section do not apply to merchandise in the course of lawful receipt or delivery, unless that merchandise remains upon the public right-of-way for a period longer than 2 hours, whereupon the provisions of this Section apply.

"D. The provisions of this Section do not apply to depositing material in public right-of-way for less than 2 hours, unless the material is deposited with the intent to interfere with free passage or to block or attempt to block or interfere with any persons(s) using the right-of-way."

"* * * * *

"[PCC 14A.50.050] provides that such structures are declared a public nuisance and authorizes, among other people, the Chief of Police to summarily abate any such obstruction, which leads me to conclude on probably a couple of alternative grounds that [defendant] had no right to privacy in an illegal structure on the public right-of-way, whether he lived there and that would otherwise—or for other purposes—be considered his residence or not.

"* * * * *

"* * * I don't think lifting a flap of an unauthorized structure such as this could be considered an unlawful search when the police have the authority summarily to simply remove it.

"Therefore, I conclude that Officer Lowry was in a place where he had a right to be, including with the tarp flap lifted by Officer Kofoed when Officer Lowry saw the glass pipe and the lighter in [defendant's] hands, in plain view at this point."

After waiving his right to a jury trial, defendant was convicted on both charges. He now appeals, assigning error to the denial of his motion to suppress.

The disposition of this appeal turns on whether, in lifting the tarp to the structure, revealing its interior, Kofoed invaded a constitutionally protected privacy interest, rendering that action an unlawful warrantless search. In disputing that matter, the parties reprise their contentions before the trial court: Defendant argues that the structure was his residence and, consequently, he necessarily had a protected privacy interest associated with that structure. The state counters that, because the structure was erected in violation of city code provisions[2] that authorized police to "summarily abate" the illegal structure, defendant had no cognizable privacy interest under either the state or federal constitutions.

Adhering to the requisite "first things first" construct, *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983), we begin with defendant's argument under Article I,

_____

[2] The trial court determined that defendant had violated not only PCC 14A.50.050, but PCC 14A.50.020 as well, which prohibits camping on public rights-of-way.

section 9, which provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" "If the government conduct did not invade a privacy interest, then no search occurred; Article I, section 9, is not implicated, and the inquiry is concluded." *State v. Davis*, 237 Or App 351, 355, 239 P3d 1002 (2010).

Defendant argues that the officer's conduct of lifting up the tarp did invade his privacy interest. He posits that, because (as the trial court determined) the structure constituted his residence and he had erected physical barriers "to establish a zone of privacy," any invasion of that space implicated the same privacy interests as those associated with more "traditional" residential structures, such as homes or apartments. *See, e.g.*, *State v. Tanner*, 304 Or 312, 321, 745 P2d 757 (1987) ("Residence in a house is uniformly deemed to be a sufficient basis for concluding that the violation of the privacy of the house violated the residents' privacy interests."); *State v. Louis*, 296 Or 57, 60, 672 P2d 708 (1983) ("[L]iving quarters * * * are the quintessential domain protected by the constitutional guarantee against warrantless searches.").

There is undeniable appeal—and merit—to the proposition that constitutional protections of privacy cannot vary, categorically, depending on whether living space is "permanent" or "transient" and "makeshift."[3] Nevertheless, just as the "permanent" versus "makeshift" character of residential space cannot be categorically conclusive of the constitutional inquiry, neither can the "residential" character of the space.[4] That is, although the fact that the referent space was someone's residence is highly significant, it is not *per se* dispositive. Rather, the touchstone, for purposes of Article I, section 9, is whether the space is "a place that *legitimately* can be deemed private." *State v. Smith*, 327 Or 366, 372-73, 963 P2d 642 (1998) (emphasis added).

---

[3] As defendant observes,

"a homeless person living in the street does not have the privilege of maintaining solid physical barriers within which to conduct private activities. Yet, social norms allow the homeless person a modicum of dignity."

[4] We do not understand defendant to acknowledge any principled limitation or qualification of such categorical protection of "residential" space.

In *State v. Campbell*, 306 Or 157, 171, 759 P2d 1040 (1988), the court stated that the underlying principle to Article I, section 9's prohibition on unreasonable searches is "'the people's' freedom from [government] scrutiny." Thus, we explained in *State v. Holiday*, 258 Or App 601, 310 P3d 1149 (2013), that the focus of our inquiry under Article I, section 9, is "whether the particular practice that is alleged to be a search, 'if engaged in wholly at the discretion of the government, will significantly impair the people's freedom from scrutiny.'" *Id.* at 607 (quoting *Campbell*, 306 Or at 171) (some internal quotation marks omitted). We further explained:

> "In focusing on [the above question], the court must consider the particular context in which the government conduct occurred and also consider the interest for which defendant asserts constitutional protection and determine whether that interest is private within the meaning of Article I, section 9. * * * [The privacy interest under Article I, section 9,] is an interest in freedom from particular *forms of scrutiny*. Thus, in cases involving the alleged violation of a protected privacy interest, the analytical focus is on the government's conduct rather than on a defendant's subjective expectations."

*Id.* (internal quotation marks and citations omitted; emphasis in original).

Here, our "focus * * * on the government's conduct"—and, particularly, its implications for "the people's freedom from scrutiny," *id.*—is fundamentally informed by three uncontroverted circumstances. First, defendant's structure violated the city code prohibition against temporary structures on a public right-of-way. Second, the police had authorization, under the city code, to summarily abate any such obstruction, meaning that the officers were authorized under the city code to summarily deconstruct and remove the encroaching structure.[5] And, third, the police had previously informed defendant that he could not camp in that

---

[5] Defendant contends that the police officers did not approach his structure for the purpose of removing it, but to see if he was engaged in illegal activities. The trial court did not render any finding as to that innately factual matter. We note, however, that there is evidence in the record that the officers approached defendant's structure because they were "thinking about removing [the structure]." *See* 269 Or App at 4. Thus, there is evidence that at least part of Kofoed's motivation in lifting the tarp was to address the code violation.

spot.[6] Given the combination of those circumstances, the police conduct here did not violate the constitutional protections against being subjected to impermissible forms of government scrutiny. Accordingly, the officers' conduct did not violate Article I, section 9.

We proceed to defendant's Fourth Amendment challenge.[7] The Fourth Amendment protects an individual's reasonable expectation of privacy—that is, an expectation "that society is prepared to recognize as reasonable." *State v. Wacker*, 317 Or 419, 427-28, 856 P2d 1029 (1993) (internal quotation marks and citations omitted).

In analogous circumstances, other jurisdictions have considered whether a government agent's entry into a person's temporary structure built on public land violates the Fourth Amendment or similar "reasonable expectation"-based law. Those jurisdictions have uniformly held that a person has no "reasonable expectation of privacy" in a temporary structure illegally built on public land, where the person knows that the structure is there without permission and the governmental entity that controls the space has not in some manner acquiesced to the temporary structure. *See United States v. Ruckman*, 806 F2d 1471, 1472-73 (10th Cir 1986) (the Fourth Amendment was not violated, because the defendant held no objectively reasonable expectation of privacy in the cave he had resided in for several months, where the cave was on public land, and the defendant admitted that he was trespassing and subject to immediate ejectment); *Amezquita v. Hernandez-Colon*, 518 F2d 8, 11 (1st Cir

---

[6] Those circumstances distinguish this case from *State v. Wolf*, 260 Or App 414, 425, 317 P3d 377 (2013), in which we held that the defendant's temporary structure and surrounding outdoor area at his *lawfully rented campsite* constituted his "place of residence," for purposes of determining whether he could lawfully possess a firearm within his campsite, under ORS 166.250. *Cf. State v. Clemente-Perez*, 261 Or App 146, 157-58, 322 P3d 1082, *rev allowed*, 356 Or 397 (2014) (concluding that the defendant's truck that was parked under an awning structure on the defendant's property adjacent to the house was not part of the defendant's "place of residence").

[7] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

1975), *cert den,* 424 US 916 (1976) (members of a squatter community had no Fourth Amendment reasonable expectation of privacy in their homes on government-owned land, because they "had no colorable claim to occupy the land * * * [and] had been asked twice to depart voluntarily"); *People v. Nishi,* 207 Cal App 4th 954, 963, 143 Cal Rptr 3d 882, 891 (2012) (the Fourth Amendment was not violated, because the defendant did not have an objectively reasonable expectation of privacy within the "curtilage" of his campsite, where the defendant was illegally camped on public land, the defendant knew it was illegal, and the defendant had not been given permission to camp there); *People v. Thomas,* 38 Cal App 4th 1331, 1335, 45 Cal Rptr 2d 610 (1995) (the police did not violate the defendant's Fourth Amendment rights when they searched the box he was living in on a public sidewalk: "[A] person who occupies a temporary shelter on public property without permission and in violation of an ordinance prohibiting sidewalk blockages is * * * without a reasonable expectation that his shelter will remain undisturbed.").[8]

Conversely, a "reasonable expectation of privacy" has been held to exist where the governmental entity that controlled the space has, by permission or acquiescence, allowed the structure to be on the public land in question, even if the structure was not legally permitted. *See U.S. v. Sandoval,* 200 F3d 659, 661 (9th Cir 2000) (under the Fourth Amendment, the defendant had an objectively reasonable expectation of privacy in his tent on Bureau of Land Management (BLM) land, where the defendant "was never instructed to vacate or risk eviction, and the record does not establish any applicable rules, regulations or practices concerning recreational or other use of BLM land. Indeed, whether [the defendant] was legally permitted to

---

[8] *But cf. State v. Mooney,* 218 Conn 85, 100-01, 588 A2d 145, *cert den,* 502 US 919 (1991) (finding a reasonable expectation of privacy in a duffel bag and closed cardboard box that the defendant, a homeless person, kept underneath a bridge abutment, because the bag and box were "closed containers" found in a secluded place that the police knew the defendant regarded as his home, the bag and box were not with the defendant at the time of the search because the officers had arrested him and taken him into custody, and "the purpose of [the officers'] search was to obtain evidence of the crimes for which he was in custody"). In this case, defendant does not argue that his tarp structure was a "closed container" in which he had a right to privacy.

be on the land was a matter in dispute."); *State v. Pruss*, 145 Idaho 623, 627, 181 P3d 1231, 1235 (2008) (under the Fourth Amendment and the Idaho Constitution, the defendant had an objectively reasonable expectation of privacy in his temporary shelter, despite it being constructed on public land not designated for camping, because the State of Idaho had a "longstanding custom" of "[u]tilizing public lands for outdoor recreational activities," including on public lands not designated for camping, and because there was no evidence that the defendant had been told to leave); *People v. Hughston*, 168 Cal App 4th 1062, 1071, 85 Cal Rptr 3d 890 (2008) (the defendant had a Fourth Amendment reasonable expectation of privacy in a tarp structure "erected on land specifically set aside for camping during [a] music festival"); *State v. Dias*, 62 Haw 52, 55, 609 P2d 637, 640 (1980) (the defendants had a Fourth Amendment reasonable expectation of privacy in a shack that was part of a group of shacks called "Squatter's Row," located on land owned by the State of Hawaii, because "Squatter's Row" had been "allowed to exist by sufferance of the State for a considerable period of time").[9]

The gravamen of those decisions is that a person has no reasonable expectation of privacy interest in a temporary shelter erected on public space unless the governmental entity controlling the space has either authorized the structure or, over a period of time, acquiesced in its existence. Thus, where erecting a structure in the public space is illegal and the person has been so informed and told that the

___

[9] Defendant also invokes *Lavan v. City of Los Angeles*, 693 F3d 1022 (9th Cir 2012), *cert den*, ___ US ___, 133 S Ct 2855 (2013), as support for his argument that he had a right of privacy within his temporary structure on the public sidewalk. In *Lavan*, the issue was whether city employees could summarily seize and destroy a person's unabandoned personal property left temporarily on a public sidewalk, and the court emphasized that it did not need to answer whether a person had a reasonable expectation of privacy in his or her personal property; the issue before it was whether "there was some meaningful interference with [a person's] possessory interest in [his or her] property." *Id.* at 1027 (internal quotation marks omitted). In *dicta*, the court suggested that a person's expectation of privacy in his or her unabandoned shelter "may well" be reasonable. *Id.* at 1028 n 6.

In the light of the body of well-reasoned opinions in which other courts have engaged in a full consideration of whether a person had a reasonable expectation of privacy in a temporary shelter constructed on public land, we decline to embrace *Lavan*'s ambivalent *dicta*.

structure must be removed, there is no "reasonable expectation of privacy" associated with the space. Accordingly, under the totality of the circumstances in this case, the officers' conduct did not violate the Fourth Amendment.[10]

The trial court correctly denied defendant's motion to suppress.

Affirmed.

---

[10] Defendant contends, for the first time on appeal, that the circumstances of this case—and, specifically, the officers' failure to remove the structure when they first encountered it a week before—bring it within the "acquiescence" qualification addressed above. *See Dias*, 62 Haw at 55, 609 P2d at 640. We decline to address that contention because it is unpreserved. We note, particularly, that any determination of "acquiescence" is innately factual and circumstantial—for example, Lowry testified, "Usually, we'll give them the opportunity to take it down and move it themselves. If not, then we will generally arrest them [and] cite them for erecting the structures on the public rights of ways"; Kofoed testified, "[W]e usually try to be proactive removing those things from the sidewalk"—and the trial court was not called upon to render findings regarding the city's actual practices with respect to the timing of removal of encroaching structures. We observe, further and parenthetically, that, while the conduct establishing acquiescence in *Dias* had continued "for a considerable period of time," in this case only a week had elapsed between the officers' initial and subsequent contact with defendant.